No. 75,199

IN THE MATTER OF THE APPEAL OF SCHOLASTIC BOOK CLUBS, INC., FROM AN ORDER OF THE DIRECTOR OF TAXATION ON ASSESSMENT OF COMPENSATING USE TAX.

(920 P.2d 947)

Opinion filed July 12, 1996.

*Martin I. Eisenstein*, of Brann & Isaacson, of Lewiston, Maine, argued the cause, and *David W. Bertoni*, of the same firm, and *S. Lucky DeFries* and *Jeffrey A. Wietharn*, of Coffman, DeFries & Nothern, of Topeka, were with him on the briefs for appellant Scholastic Book Clubs, Inc.

*James A. Bartle*, of Kansas Department of Revenue, argued the cause, and *Cathleen M. Reeder*, of the same agency, was on the brief for appellee Kansas Department of Revenue.

The opinion of the court was delivered by

LOCKETT, J.: Scholastic Book Clubs, Inc. (Scholastic), an out-of-state based business, sells books at discount prices to elementary school teachers and students throughout the United States. The Kansas Department of Revenue (KDR) assessed a use tax on the gross receipts of Scholastic's sales in Kansas under the Kansas Compensating Tax Act (KCTA), K.S.A. 79-3701 *et seq*. The tax was upheld by the Director of Taxation (Director). Scholastic appealed to the Board of Tax Appeals (BOTA), claiming it is not subject to the compensating tax because it is not a retailer doing business in this state and does not have a nexus with this state. BOTA affirmed the order of the Director, affirming the assessment. Scholastic ap-

pealed. The appeal was transferred to this court on the KDR's motion.

The parties stipulated to the relevant facts. Scholastic is a Missouri corporation with its principal offices and distribution center in Missouri. Scholastic sells books, videotapes, and audio tapes to primary and secondary school students throughout the United States, including Kansas. Scholastic maintains no offices, warehouses, or other facilities in Kansas. Scholastic has neither bank accounts in Kansas nor a contractual relationship with any banks or financial institutions in Kansas. No Scholastic employees conduct Scholastic's business in Kansas. Scholastic markets its books by mailing catalogs to schools and teachers in Kansas. The catalogs are sent through the United States mail from locations outside Kansas. Several hundred Kansas schools, and many Kansas teachers and other school representatives, participate yearly in the purchases of books and tapes by students from Scholastic. The written material given to the teachers specifically informs the teachers they are not Scholastic's expressed or implied agents. Scholastic included the language denying a delegation of authority only after a California court held it was responsible for collecting and remitting use tax in California. See *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734, 255 Cal. Rptr. 77 (1989).

Scholastic's catalogs describe the various books and tapes which Scholastic offers for sale and lists the price for each item. The catalogs contain order forms, which teachers and other school personnel distribute to students. A message to parents is provided on each student order form directing the parent to "[c]heck the titles your child wants. Put this order form and payment in an envelope for your child's teacher." When teachers receive the student order forms, they consolidate the orders onto a classroom order form. Tables are provided with the classroom order form to assist the teachers in the computation of the total paid items and the total amount due. The books and tapes ordered by the teachers for their students are shipped by common carrier and other providers of interstate commerce from Scholastic's facilities in Missouri to the Kansas schools and teachers. Teachers or other school personnel

receive the materials ordered and distribute the books and tapes to the proper students.

As part of its marketing plan, Scholastic offers "Free Classroom Bonuses" through a "Classroom Bonus Plan." Bonus points are provided based upon the amount of the classroom order and, as specified in the classroom order form, are redeemed for books in the catalog or bonus items set forth in the order material, or in Scholastic's "Bonus Catalog for the Classroom." The classroom order form advises the teacher or school personnel placing the student orders of the bonus points that are credited as a result of the order. The bonus catalog is sent to the teachers or other school personnel in conjunction with the books and tapes catalog. Although the bonus catalog states that the bonus points are awarded to the class, Scholastic makes no effort to insure compliance, but instead relies upon the good faith of the teachers or school personnel to use the bonus points properly.

The KDR examined the books and records of Scholastic for the period June 1, 1987, through January 31, 1991. On June 21, 1991, the KDR issued a use tax assessment in the amount of $276,006, including interest and penalties, against Scholastic. Scholastic requested a hearing before the Director of Taxation. The Director appointed a "designee" to hear the matter. For simplicity, the designee is referred to as "Director."

Scholastic's argument to the Director was twofold. First, Scholastic contended that the teachers act on behalf of the students rather than on behalf of Scholastic. Scholastic argued no agency or representative relationship is created with the teachers because the elements of an expressed or implied contractual agreement, including a meeting of the minds and consideration, are not satisfied. Second, Scholastic argued that the teachers do not act under its authority because it specifically denied it was entering into an agency relationship with the teachers.

The KDR, on the other hand, argued that the teachers are part of Scholastic's Kansas sales force, acting as agents or representatives under the authority of Scholastic. The KDR pointed out that Scholastic gives the teachers authority to "hand out copies" of the materials, to "recommend" appropriate books, to "collect the stu-

dents' orders and tally each order," to "mail your order and payment," and to "distribute books." It argued that Scholastic not only directs the teachers to act, it accepts the benefits of their sales and issues bonus points as consideration for their services.

The KDR asserted that having an agent or a representative in the state within the meaning of K.S.A. 1995 Supp. 79-3702(h) does not require a formalistic contract establishing an agency relationship. In addition, the KDR argued that a factual analysis was unnecessary since Scholastic is estopped under Kansas law from denying the agency relationship. This argument was based upon the rationale that a principal cannot receive and retain the benefits of a transaction and, at the same time, deny the authority of the agent to enter into the transaction.

The Director first observed that in Kansas, taxation is the rule and exemption is the exception. *Assembly of God v. Sangster*, 178 Kan. 678, Syl. ¶ 3, 290 P.2d 1057 (1955). Statutory exemption provisions are strictly construed against the one requesting exemption. *Farmers Co-op v. Kansas Bd. of Tax Appeals*, 236 Kan. 632, 635, 694 P.2d 462 (1985). All doubts concerning exemption are to be resolved against the exemption and in favor of taxation. *Trustees of The United Methodist Church v. Cogswell*, 205 Kan. 847, Syl. ¶ 2, 473 P.2d 1 (1970). The Director then noted that in assessing the compensating tax, the KDR relied upon three statutory provisions. Although the Director cited the 1992 version of each relevant statute, the language of the 1992 statutes is substantially the same as in the 1995 version. The rate of the tax may fluctuate each year. K.S.A. 1995 Supp. 79-3702(g) defines "retailer" as

"every person engaged in the business of selling tangible personal property for use within the meaning of this act, except that, when in the opinion of the director it is necessary for the efficient administration of this act to regard any salesperson, representatives, truckers, peddlers or canvassers as the agents of the dealers, distributors, supervisors, employers or persons under whom they operate or from whom they obtain the tangible personal property sold by them, irrespective of whether they are making sales on their own behalf or on behalf of such dealers, distributors, supervisors, employers, or persons, the director may so regard them and may regard the dealers, distributors, supervisors, employers, or persons as retailers for the purposes of this act."

K.S.A. 1995 Supp. 79-3702(h) defines "retailer doing business in this state" and any similar term as any retailer

"(1) Having or maintaining within this state, directly or by a subsidiary, an office, distribution house, sales house, warehouse or other place of business, or any agent or other representative operating within this state under the authority of the retailer or its subsidiary, irrespective of whether such place of business or agent is located here permanently or temporarily, or whether such retailer or subsidiary is admitted to do business within the state."

K.S.A. 1995 Supp. 79-3703 levies the rate of compensating tax:

"There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using, storing, or consuming within this state any article of tangible personal property. Such tax shall be levied and collected in an amount equal to the consideration paid by the taxpayer multiplied by the rate of 4.9%. All property purchased or leased within or without this state and subsequently used, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been subject to the Kansas retailers' sales tax had the transaction been wholly within this state."

After referring to the three statutes, the Director noted that for Kansas to levy a compensating use tax, Scholastic must be a retailer doing business in Kansas. The resolution of that question depended upon whether Scholastic had "any agent or other representative operating within this state" with authority sufficient to create a nexus that satisfied the requirements of the Commerce Clause. The Director concluded this was a question of law.

The Director pointed out that while an express contract may create an agency relationship, conduct implying an agency relationship serves just as well. Express agency exists when the principal expressly authorizes the agent to do delegable acts, and implied agency may exist if it appears from the parties' words, conduct, or other circumstances that the principal intended to give the agent authority to act. *Turner and Boisseau v. Marshall Adjusting*, 775 F. Supp. 372, 378 (D. Kan. 1991).

The Director noted that if it is easy to find agency in Kansas, it is correspondingly difficult to disclaim it. Under Kansas law, an agency relationship may exist notwithstanding either a denial of the agency by the alleged principal or a lack of mutual understanding of agency between the parties. *Moore v. Adkins*, 2 Kan. App. 2d

139, Syl. ¶ 7, 576 P.2d 245 (1978); *Turner and Boisseau*, 775 F. Supp. 372, 378. The Director pointed out that Scholastic's mere claim that teachers are not its agents does not make it so.

The Director observed that whether Kansas schoolteachers constitute an in-state sales force for Scholastic depends upon whether the teachers acted as Scholastic's agents or representatives and under its authority. The Director pointed out that Black's Law Dictionary 85 (Rev. 4th Ed., 1968) defines "agent" as "[a] person authorized by another to act for him, or intrusted with another's business," and defined "representative" as "One who represents or stands in the place of another." Black's Law Dictionary 1466. The Director then noted that in general, agency must rest on some kind of contract, express or implied, between principal and agent. See *Lord v. Jackman*, 206 Kan. 22, 26, 476 P.2d 596 (1970). General contract rules apply to agency, and as to the essential matters there must be consideration, mutuality, and a meeting of the minds. *Lindsley v. Forum Restaurants, Inc.*, 3 Kan. App. 2d 489, 491, 596 P.2d 1250, *rev. denied* 226 Kan. 792 (1979).

The Director found that Kansas schoolteachers acted on Scholastic's behalf as its agents or representatives under Scholastic's authority. This conclusion was based upon the fact that Scholastic operated through Kansas schoolteachers who used part of their school day to promote Scholastic's products and participated in sales transactions which benefitted Scholastic. Scholastic instructs the Kansas teachers to pass out order forms to their students, recommend appropriate books, collect the orders and payments, forward orders to Scholastic, and eventually distribute ordered material. The Director stated that Kansas teachers are Scholastic's solicitors and observed that "but for" the Kansas teachers it is questionable whether Scholastic would make sales or derive revenue from Kansas customers. The Director found that the Kansas teachers constituted an in-state sales force of Scholastic.

The Director determined that under these circumstances the teachers' actions and presence satisfied the statutory requirements of K.S.A. 1995 Supp. 79-3702(g) and (h). Therefore, Scholastic was a "retailer" doing business in Kansas. The Director then concluded that the Kansas teachers' actions and presence in the state on be-

half of Scholastic created the physical presence required for a "substantial nexus" within Kansas. The Director affirmed the assessment of the tax, then abated the penalty because it was not clear Scholastic should have known the tax was due. Because the Director was without authority to adjust interest, he upheld the assessment for interest at the statutory rate. Scholastic's request for reconsideration by the Director was denied. Scholastic appealed to BOTA.

BOTA found that the Director erroneously determined that there was an implied agency between Scholastic and the teachers. BOTA pointed out that Scholastic had denied an intent to create an agency. BOTA reached this conclusion because the principal, Scholastic, had specifically stated to the teachers in its written information that they were not acting as its agents. Therefore, neither an actual nor an implied agency existed.

BOTA then observed that in Kansas, there are two forms of agency—actual, which includes express or implied agency, and apparent agency. See *Mohr v. State Bank of Stanley*, 241 Kan. 42, 45, 734 P.2d 1071 (1987). In express agency, the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act. *Gardner v. Rensmeyer*, 221 Kan. 23, 27, 557 P.2d 1258 (1976) (quoting *Greep v. Bruns*, 160 Kan. 48, Syl. ¶ 4, 159 P.2d 803 [1945]). BOTA pointed out that a category of express agency, known as implied agency, exists where the principal and agent intend to create a relationship whereby when the agent acts on this authority, others will believe in and rely on the agent's acts. *Gardner v. Rensmeyer*, 221 Kan. at 26-27. See *Rodgers v. Arapahoe Pipe Line Co.*, 185 Kan. 424, Syl. ¶ 3, 345 P.2d 702 (1989).

BOTA then noted that there is another type of agency, apparent agency, which is created when the principal allows a third party to conclude that the purported agent is, in fact, an agent of the principal despite the lack of authority granted to the purported agent. BOTA observed that although Scholastic denied that the Kansas teachers represent it, they perform many duties on behalf of Scholastic: The teachers pass out Scholastic's order forms. They compile the orders under Scholastic's direction. They collect money for

remitting to Scholastic. They remit the money and orders to Scholastic and distribute the books they receive from Scholastic. The teachers also handle disputes between the student and retailer and receive bonus points as consideration. BOTA then concluded that the Kansas teachers act as the apparent agents of Scholastic.

BOTA found Scholastic (1) was a retailer doing business in the state of Kansas under K.S.A. 1995 Supp. 79-3702(h) and (2) had a sufficient nexus with the state of Kansas to satisfy the Commerce Clause of the United States Constitution. Scholastic's subsequent motion for reconsideration was denied. BOTA affirmed the assessment of tax against Scholastic. Scholastic appealed.

## Standard of Review

BOTA orders are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* K.S.A. 74-2426(c). The party challenging BOTA's action has the burden to prove that the action taken by BOTA was erroneous. See K.S.A. 77-621(a). Here, Scholastic argues that BOTA, in concluding that the teachers acted as its agents, "erroneously interpreted or applied the law." See K.S.A. 77-621(c)(4).

The interpretation of a statute by an administrative agency charged with the responsibility of enforcing the statute is entitled to judicial deference. This is called the doctrine of operative construction. *State Dept. of SRS v. Public Employee Relations Board,* 249 Kan. 163, 166, 815 P.2d 66 (1991). Deference to an agency's interpretation is particularly appropriate when the agency is one of special competence and experience. See *Boatright v. Kansas Racing Comm'n,* 251 Kan. 240, 246, 834 P.2d 368 (1992). Whether an agency has erroneously interpreted or applied the law in an unconstitutional manner is a question of law over which an appellate court's review is unlimited. K.S.A. 77-621(c)(1); see *Todd v. Kelly,* 251 Kan. 512, 515, 837 P.2d 381 (1992).

## RETAILER DOING BUSINESS IN KANSAS

Article I, § 8 of the United States Constitution states that Congress has the power to "regulate Commerce with foreign Nations, and among the several States." The United States Supreme Court

has recognized that the Commerce Clause does more than make an affirmative grant of power; it also prohibits certain State actions that interfere with interstate commerce. *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 119 L. Ed. 2d 91, 112 S. Ct. 1904 ( 1992). *Quill* restated the four-part test used in evaluating the validity of state taxes under the Commerce Clause:

"[W]e will sustain a tax against a Commerce Clause challenge so long as the 'tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.' [Citation omitted.]" 504 U.S. at 311.

In determining whether the Kansas compensating tax violates the Commerce Clause, the parties here argue only the substantial nexus requirement of the test.

The parties agree that Scholastic is a retailer but disagree as to whether Scholastic is a retailer doing business in Kansas. Scholastic is a retailer doing business in Kansas if it has or maintains "any agent or other representative operating within this state under the authority of the retailer." K.S.A. 1995 Supp. 79-3702(h)(1). Scholastic asserts that it has no agents in Kansas; therefore, there is no substantial nexus to Kansas. It argues that because it has no agents in Kansas there is no substantial nexus to Kansas requiring it to collect and remit the Kansas compensating tax.

In finding that Scholastic was required to collect and remit the tax, BOTA addressed the question of agency and found that under the written agreement no express or implied agency relationship existed between Scholastic and the Kansas teachers. After rejecting the KDR's claim that an expressed or implied agency existed, BOTA determined that under the facts an apparent agency existed between Scholastic and the teachers, citing *Kunz v. Lowden*, 124 F.2d 911 (10th Cir. 1942). On appeal, the parties present different arguments with respect to this finding.

Scholastic argues that the doctrine of apparent agency applies only to a third party who is induced by the parties to believe an agency exists and cannot be used as a pretext for finding that Scholastic is a retailer doing business in this state. As authority for this argument, Scholastic relies on *Theis v. duPont, Glore Forgan Inc.*,

212 Kan. 301, 510 P.2d 1212 (1973), which discussed the doctrines of apparent agency and agency and set out the legal distinction between the two doctrines and the separate duties imposed by law. In that case the plaintiff, Theis, retained the defendant, duPont, a brokerage firm, for the purpose of trading in the commodities market. The duPont employee who handled Theis' account, Craig Benjamin, engaged in unauthorized transactions on Theis' account. Theis repeatedly told Benjamin not to do so, and after one such unauthorized transaction, Theis closed his account with duPont. Theis sued duPont for damages from the unauthorized transaction. duPont argued that Benjamin, its employee, had Theis' implied or apparent authority to engage in the transactions on Theis' account. 212 Kan. at 306. The *Theis* court first discussed the types of agency, observing:

"The law recognizes two distinct types of agencies, one actual and the other ostensible or apparent. The authority of an actual agent may be either express or implied. The distinctions between express, implied and apparent authority are explained in *Greep v. Bruns*, 160 Kan. 48, 159 P.2d 803 [(1945)], as follows:

'The authority of an actual agent may be either express or implied. It is express if the one sought to be charged has delegated authority to the agent by words which expressly and directly authorize him to do a delegable act. It is implied if from statements of the parties, their conduct and other relevant circumstances it appears the intent of the parties was to create a relationship permitting the assumption of authority by an agent which when exercised by him would normally and naturally lead others to believe in and rely on his acts as those of the principal.

'An ostensible or apparent agent is one whom the principal has intentionally or by want of ordinary care induced and permitted third persons to believe to be his agent even though no authority, either express or implied, has been conferred upon him.' (Syl. ¶¶ 4 and 5)." 212 Kan. at 306.

The *Theis* court then found the doctrine of apparent agency inapplicable under the facts, observing: "The *Greep* case makes it clear the apparent authority doctrine has relevance only when a third party has dealt with an ostensible agent and then seeks to bind the principal to a transaction despite the fact that the agent had no actual authority to bind him." 212 Kan. at 306. It noted that Theis' contract was with duPont, though acting through Ben-

jamin as the account executive, and duPont, as Benjamin's employer, did not occupy the position of stranger or third party to the agency contract. The court concluded that because there was no third party involved, there was no apparent agency.

Similar principles of agency were stated in *Mohr v. State Bank of Stanley*, 241 Kan. 42. Loyd, the co-owner of two companies (Tri-County and Mohr-Loyd Leasing) deposited checks made out to the two companies into the bank account of a third company (Earthborn Energy) owned. solely by Loyd. Tri-County and the other co-owner, Mohr, sought to recover the proceeds of the checks from the bank in which the checks were deposited. The bank contended that, as a matter of law, Loyd had implied or apparent authority to endorse and negotiate the checks. The *Mohr* court cited the principles of agency stated in *Greep* as well as other authorities discussing express and implied agency. In rejecting the claim that an apparent agency existed, the *Mohr* court stated:

> "Apparent agency is based on intentional actions or words of the principal toward third parties which reasonably induce or permit third parties to believe that an agency relationship exists. In the case before us, there were no actions by Tri-County and no words expressed on its behalf to the State Bank of Stanley to induce or permit it to believe that Loyd was the agent of Tri-County and authorized to deposit corporate checks in his own personal business account. . . . We find no basis in the evidence for the existence of any apparent agency." 241 Kan. at 46.

Both *Mohr* and *Theis* are instructive. Each points out that under the doctrine of apparent agency, the principal has conferred no authority, either express or implied, on the agent. *Mohr*, 241 Kan. 42, Syl. ¶ 4; *Theis*, 212 Kan. 301, Syl. ¶ 6. Further, both *Mohr* and *Theis* conclude that apparent agency rests on some action by the alleged agent toward a third party. *Theis* clearly states that the doctrine of apparent agency applies only when a third party has dealt with an apparent agent and that third party seeks to bind the principal to the transaction entered into by its apparent agent.

Although an appellate court gives deference to the agency's interpretation of a statute, BOTA's determination of a question of law is not binding on an appellate court. Whether an apparent agency exists and if that agency relationship is sufficient for the

KDR to assess a use tax on the gross receipts of Scholastic's sales in Kansas under the Kansas Compensating Tax Act are questions of law over which an appellate court's review is unlimited.

K.S.A. 1995 Supp. 79-3702(h) states that a retailer is a "[r]etailer doing business in this state" if it has "any agent or other representative operating within this state *under the authority of the retailer.*" (Emphasis added.) Because the third party to the apparent agency relationship, the students, are not seeking to enforce the agency relationship, the doctrine of apparent agency has no application and is insufficient as a matter of law to bring a retailer within the scope of K.S.A. 1995 Supp. 79-3702(h).

The KDR argues that Scholastic's statement in its written material that teachers are not its agents is ineffective because Scholastic receives and retains the benefits of the teachers who conduct the transactions on Scholastic's behalf. The KDR asserts that agency by ratification is established. See *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734, 738, 255 Cal. Rptr. 77 (1989).

Agency is a comprehensive term embracing an almost limitless number of relations between two or more persons or entities by which one party, usually called the "agent" or "attorney," is authorized to do certain acts for, or in relation to rights or property of, the other, who is denominated the "principal," "constituent," or "employer." The relationship of agency may be expressly created or arise by inference from the relation of the parties without proof of any express agreement, or may be created by law. Whether one is the agent of another for a specific purpose depends upon whether he or she has power to act with reference to the subject matter. To establish an agency relationship, there need be no evidence of authority to act if the party performs duties or creates benefits of which the other person avails himself or herself. *Kunz*, 124 F.2d at 913.

While an express contract may create an agency relationship, conduct implying an agency relationship serves just as well. An implied agency may exist if it appears from the parties' words, conduct, or other circumstances that the principal intended to give the agent authority to act. *Turner and Boisseau v. Marshall Adjusting,*

775 F. Supp. 372, 378 (D. Kan. 1991). An implied agency rela-
tionship may exist notwithstanding either a denial of the agency by
the alleged principal or a lack of mutual understanding of agency
between the parties. 775 F. Supp. at 378; *Moore v. Adkins*, 2 Kan.
App. 2d 139, Syl. ¶ 7, 576 P.2d 245 (1978).

First, we note that an implied agency may exist if it appears from
a party's words, conduct, or other circumstances that the principal
intended to give the agent authority to act. Second, that agency
relationship may exist notwithstanding a denial by the alleged prin-
cipal or whether the parties understood it to be an agency. We
conclude that Kansas teachers are acting under Scholastic's au-
thority once they undertake to sell the books to the students. By
Scholastic's accepting orders and payments and shipping merchan-
dise to teachers for distribution to the student purchasers, the Kan-
sas teachers are the implied agents of Scholastic.

## Sufficient Nexus

Because an agency exists we must determine if there is a sub-
stantial nexus to this state requiring the retailer (Scholastic) to col-
lect the tax. In *Quill*, 504 U.S. at 311, the Supreme Court followed
the substantial nexus rule set out in *Nat. Bellas Hess v. Dept. of
Revenue*, 386 U. S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967):
"[A] vendor whose only contacts with the taxing State are by mail
or common carrier lacks the 'substantial nexus' required by the
Commerce Clause." The Court recognized that "[w]hether or not
a State may compel a vendor to collect a sales or use tax may turn
on the presence in the taxing State of a small sales force, plant, or
office." 504 U.S. at 315.

In determining whether there is substantial nexus providing
Kansas the authority to collect the compensating tax from an out-
of-state corporation, we will review and analyze three cases from
other jurisdictions. In *Scholastic Book Clubs, Inc. v. State Bd. of
Equalization*, 207 Cal. App. 3d 734, Scholastic brought a similar
action for refund of use taxes assessed by California. In that case,
the retailer (Scholastic) was also a foreign corporation. Similarly,
California teachers received a catalog and order forms from Scho-
lastic. The sale of books to students through teachers was accom-

plished in the identical manner as in our case. After being assessed for compensating taxes due, Scholastic appealed and made an argument similar to their argument before this court. In reaching its decision, the California court reviewed several cases. It observed that the case upon which Scholastic most strongly relied was *Nat. Bellas Hess v. Dept. of Revenue*, 386 U.S. 753, in which the Illinois Supreme Court invalidated an Illinois tax on an out-of-state merchandiser whose only contact with Illinois was through the mail or by common carrier. In that case, the Missouri retailer mailed catalogs to active or recent customers throughout the country twice a year. All Illinois customers mailed orders directly to the Missouri plant, from which the goods were sent directly to the customer through the mail or by common carrier. The California court noted that the Missouri retailer had no agents in Illinois, but sold directly by catalogs sent through the mail. The California court observed that the basis of the Illinois court's determination that the Illinois use tax could not be assessed against the Missouri retailer was that the United States Supreme Court had never allowed a state to impose the duty of use tax collection and payment upon a retailer whose only connection with customers in the state is by common carrier or through the United States mail.

The California court then reviewed the case relied upon by the State, *Scripto v. Carson*, 362 U.S. 207, 4 L. Ed. 2d 660, 80 S. Ct. 619. In that case, the Georgia retailer had written contracts with Florida jobbers, who solicited orders in Florida, forwarded the resulting orders to Georgia for shipment, but collected no payment for the order from the customer. The jobbers were described in their contract with the Georgia retailers as "independent contractors," were not required to work exclusively for the Georgia retailer, and were paid solely on commission. The fact that the representatives were not regular and exclusive employees of the Georgia retailer was characterized as "a fine distinction . . . without constitutional significance." 362 U.S. at 211. The United States Supreme Court concluded that the requisite nexus was sufficient for Florida to impose the use tax on the Georgia retailer insofar as the sales were made in Florida by local representatives who conducted business in the taxing state.

The California court found that the *Scholastic* case was more similar to *Scripto* than to *Nat. Bellas Hess*. It concluded that although the teachers did not have written agency agreements with the retailer, they served the same function as did the Florida jobbers in *Scripto*—obtaining sales in California from local customers for a foreign corporation. It observed that unlike the Florida jobbers, the California teachers also collected payment from the purchasers, and received and distributed the merchandise. The Court pointed out that Scholastic not only relied, but in fact depended, upon the teachers to act as its conduit to the California students. It found there was an implied contract between Scholastic and the teachers—Scholastic rewarded the teachers with bonus points for merchandise if they obtained and processed the orders. It found the bonus points were similar to the Florida jobbers' commission. The California court concluded that the teachers who took students' catalog orders for books sold by a foreign corporation were, for tax purposes, operating "under the authority of" the corporation. Furthermore, by accepting orders and payment and by shipping merchandise, the corporation ratified the acts of the teachers, confirming their authority as its agents or representatives. It determined that under these circumstances, Scholastic was responsible to collect the California use tax.

In *Quill Corp. v. North Dakota*, 504 U.S. 298, a mail-order house incorporated in Delaware made annual sales to about 3,000 customers in North Dakota. The mail-order house had no offices or warehouses in North Dakota or employees that worked or resided in North Dakota. Orders were solicited through catalogs and flyers sent into North Dakota by mail. All merchandise delivered to North Dakota customers was by mail or common carrier from out-of-state locations. When the mail-order house refused to collect the use tax from its North Dakota customers, North Dakota filed an action to require the mail-order house to pay taxes, as well as interest and penalties. The mail-order house alleged that the North Dakota use tax statute as applied violated the federal Constitution's Commerce Clause and the Due Process Clause of the Fourteenth Amendment. The district court ruled in favor of the mail-order house, finding that North Dakota had failed to establish a sufficient

nexus between the mail-order house and the state. The Supreme Court of North Dakota reversed.

On *certiorari*, the United States Supreme Court noted that the Due Process Clause did not bar enforcement of the state's use tax if (a) the mail-order house had purposely directed its activities at North Dakota residents, (b) the magnitude of such contacts was sufficient for due process purposes, and (c) the use tax was related to the benefits that the mail-order house received from access to the state. After reviewing the facts, it reversed the North Dakota Supreme Court. The United States Supreme Court observed that a vendor who solicits sales by catalogs and whose only connection with customers in the taxing state is by common carrier or through the United States mail is free from state-imposed duties to collect sales and use tax because such vendor lacks the substantial nexus with the taxing state required by the Commerce Clause.

In *Pledger v. Troll Book Clubs, Inc.*, 316 Ark. 195, 871 S.W.2d 389 (1994), a New Jersey corporation's order forms listing current book selections for a particular grade were mailed to Arkansas teachers. The catalogs instructed the Arkansas teachers how to collect the students' orders, how to consolidate the orders, and how to collect the money for the orders. The teacher then filled out a master list and sent the money to the out-of-state retailer. The books were then sent to the Arkansas teacher by the bookseller. When the books arrived, the teacher distributed the books to the students. The teachers received cash or merchandise "bonuses," depending upon the amount of the order. Troll, the New Jersey bookseller, was assessed a vendor's use tax. The bookseller brought an action under the Arkansas Tax Procedure Act. The chancellor ruled that Troll's sales of books in Arkansas was not subject to the state's use tax. The State appealed to the Arkansas Supreme Court.

The Arkansas Supreme Court noted that the Arkansas statute provided for imposition of a tax upon a vendor located outside the state if the vendor makes sales of personal property within the state. It pointed out that the Commerce Clause of the United States Constitution limits a state's ability to tax out-of-state entities when such taxation burdens interstate commerce. It observed that for

such a tax to be upheld under the Commerce Clause, the entity to be taxed must maintain a physical presence in the taxing state.

The Arkansas Supreme Court observed that unless the State could prove a formal agency relationship between the teachers and the retailer, Troll lacked the "substantial nexus" required by the federal Constitution in order to be taxed in Arkansas. 316 Ark. at 198. The court noted that the State, in its argument that the chancery court should have found an agency relationship, relied upon a case that involved the same defendant under identical arrangements for selling books, *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734.

The Arkansas Supreme Court observed that although the California case was factually on point, it was distinguishable from the Arkansas case for two reasons. First, the California case was decided prior to the United States Supreme Court decision in *Quill Corp. v. North Dakota*, 504 U.S. 298, which mandated the bright-line physical presence test for interstate mail order sales. Second, California agency law, unlike Arkansas agency law, allowed a relationship of agency to be implied retroactively by ratification. Unlike California law, in Arkansas the agency relationship must be shown to exist by proof of both authorization and control, and the doctrine of ratification cannot be implied retroactively by ratification. See *E. P. Dobson, Inc. v. Richard*, 17 Ark. App. 155, 158, 705 S.W.2d 893 (1986) (citing *Runyan v. Community Fund of Little Rock*, 182 Ark. 441, 31 S.W.2d 743 [1930]).

*Quill* and *Pledger* each determined there was an insufficient nexus for the state to require the foreign corporation to collect the state's compensating tax for the foreign corporation's sales to the state's residents. In *Quill*, all sales were made through catalogs. The seller mailed the catalog to the buyer, the buyer returned the order and payment to the seller, and the seller sent the books to the purchaser. Here, the sales are made by Kansas teachers to their students; obviously, *Quill* is factually different and does not apply.

In *Pledger*, the out-of-state seller sold its products through Arkansas teachers. All contacts, sales, and deliveries of the books sold to the students were conducted through the teachers. In rejecting the State's claim that the teachers were acting as agents for the

out-of-state seller, the Arkansas Supreme Court noted that for an agency to exist in that state, the essential elements are authorization and control. It noted that Arkansas agency law places the burden upon the party asserting the agency relationship. In the absence of these elements, the doctrine of ratification was inapplicable. The Arkansas court found that an agency relationship was not clearly proven in *Pledger*. In Kansas, the test to determine if an alleged agent possessed implied powers is whether, from the facts and circumstances of the particular case, it appears there was an implied intention to create an agency. The relation may exist, notwithstanding a denial by the alleged principal or whether the parties understood it to be an agency. *Moore v. Adkins*, 2 Kan. App. 2d 139, Syl. ¶ 7, 576 P.2d 245 (1978). Clearly, the Arkansas standard for proving the existence of an agency relationship is stricter than that required by Kansas law. Under the circumstances, *Pledger* does not apply.

We find the California case persuasive. The facts are similar to the case at bar. Although Scholastic has in its written material attempted to deny an agency relationship with the Kansas teachers, that denial is not permissible under Kansas law. Scholastic clearly has more of a connection with Kansas than catalog sales through the mail or by common carrier. Applying the test stated in *Nat. Bellas Hess* and *Quill*, Scholastic's use of the Kansas teachers to sell its product to Kansas students provides a substantial nexus with the state of Kansas. Scholastic is a retailer doing business in Kansas. Application of the KCTA does not violate the Commerce Clause.

Affirmed.